Not for Publication

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| SUZANNE SULLIVAN, Regional Director Of Region 22 Of The National Labor Relations Board For And On Behalf Of The National Labor Relations Board,<br><br>Petitioner,<br><br>v.<br><br>FAIRFIELD PARSIPPANY, LLC D/B/A FAIRFIELD INN & SUITES BY MARRIOTT,<br><br>Respondent. | Civil Action No.: 24-8413 (ES) (MAH)<br><br>OPINION |

SALAS, DISTRICT JUDGE

Before the Court is a petition for temporary injunctive relief pursuant to Section 10(j) of

the National Labor Relations Act ("NLRA") ("Section 10(j)") filed by Petitioner Suzanne Sullivan

("Petitioner" or "Sullivan"), Regional Director of Region 22 of the National Labor Relations Board

("NLRB" or the "Board"), for and on behalf of the NLRB.  (*See generally* D.E. No. 1 ("Petition");

D.E. No. 1-13 ("Mov. Br.")).[1]  Respondent Fairfield Parsippany, LLC d/b/a Fairfield Inn & Suites

By Marriott ("Respondent" or "Fairfield") filed an Opposition (D.E. No. 7 ("Opp. Br.")), and

Petitioner filed a Reply (D.E. No. 8 ("Reply Br.")).  Having considered the parties' submissions,

the parties' arguments made on the record during the show cause hearing held on October 10, 2024

---

[1]    Petitioner also filed a separate "Motion to Try the Likelihood of Success on the Merits Portion of the Petition for Temporary Injunction Under Section 10(j) of the National Labor Relations Act on the Basis of the Record in the Underlying Unfair Labor Practice Hearing and Request for Expedited Briefing and Disposition of this Motion" (D.E. No. 3), which the Court granted as unopposed on October 3, 2024 (D.E. No. 15).  Accordingly, the Court herein relies on the administrative record from the underlying NLRB proceedings in determining the likelihood of success on the merits as related to the Petition.

(the "Hearing"), and the administrative record from the underlying NLRB proceedings, for the following reasons, and for good cause having been shown, Petitioner's Petition for temporary injunctive relief pursuant to Section 10(j) of the NLRA is **GRANTED**.

## I.    BACKGROUND

### A.    Factual Background

Petitioner is the Regional Director of Region 22 of the NLRB who, for and on behalf of the NLRB, petitions this Court for temporary injunctive relief under Section 10(j) of the NLRA, pending the NLRB's final disposition of the underlying NLRB proceedings.[2]  (*See generally* Petition; Mov. Br.; Reply Br.).   Respondent is a corporate entity that currently operates the Fairfield Inn & Suites hotel located at 3535 U.S. Highway 46, Parsippany, New Jersey (the "Hotel").  (*See generally* Petition; Mov. Br.; Opp. Br.).   Non-party JSK Parsippany, LLC d/b/a Fairfield Inn & Suites by Marriott ("JSK") is a corporate entity that previously operated the Hotel, prior to August 19, 2023.[3]  (Mov. Br. at 4–5).   During the time that JSK operated the Hotel, its owners were Peter Patel (also known as Peter Viradia) and Kajal Patel (also known as Kajal Viradia); Zia Jaffrey acted as general manager of the Hotel.[4]  (*Id.*).

Before Respondent took over operations of the Hotel from JSK, the Hotel and Gaming Trades Council, AFL-CIO (the "Union") was certified on June 23, 2017, as the collective-bargaining representative of JSK's breakfast attendant, housekeeping, and maintenance employees

---

[2]     The underlying NLRB proceedings refer to the proceedings currently pending before the NLRB regarding the unfair labor practice consolidated complaint in filed in NLRB Case Numbers 22-CA-305280, 22-CA-317107, 22-CA-317582, 22-CA-325867, 22-CA-325868, 22-CA-329984, and 22-CA-331820.  (*See* D.E. No. 1-8 at 136–51; *see also* Mov. Br. at 1; Opp. Br. at 2).

[3]     JSK is not a party to this action.  In the underlying NLRB proceedings, default judgment was issued against JSK in NLRB Case Numbers 22-CA-305280, 22-CA-317107, 22-CA-317582, 22-CA-325867, 22-CA-325868, 22-CA-329984, and 22-CA-331820, based on its failure to respond and participate in the underlying proceedings.  (*See* D.E. No. 1-1 (Order Granting Motion for Default Judgment Against JSK)).

[4]     Prior to Mr. Jaffrey taking over as general manager of the Hotel, Dalay Hernandez acted as the general manager and worked in that position from August 2021 through mid-July 2022.  (Mov. Br. at 5).

employed at the Hotel.  (*See* Petition at 5 ("The following employees of JSK and subsequently of Respondent (the Unit) constitute a unit appropriate for the purposes of collective bargaining within the meaning of Section 9(b) of the Act: All full-time and regular part-time maintenance techs, breakfast hosts, housemen and housekeepers employed by [JSK]" at the Hotel (the "Bargaining Unit Employees"[5])); *see also* D.E. No. 1-7 at 3; Mov. Br. at 5).  Subsequently, on October 30, 2017, JSK adopted the Greater Regional Industry Wide Agreement ("GRIWA") and its successor agreement, with several riders.  (Petition at 5; Mov. Br. at 5; D.E. No. 1-8 at 174–261[6] (copy of GRIWA)[7]).  The initial GRIWA expired on March 31, 2018, but the successor GRIWA was effective from April 1, 2018, through March 31, 2023.  (Mov. Br. at 5; D.E. No. 1-8 at 174–261).  Seven long-term JSK employees were fervent Union supporters—maintenance employee Yoni

---

[5]      At the Hearing, Petitioner's counsel clarified that the Union represents everyone in the bargaining unit, whether or not they support the Union, and following certification, it is presumed the Union maintains its majority unless a decertification petition is lawfully filed.  (*See* Oct. 10, 2024 Hrg. Tr. at 18–21).  Respondent's counsel stated at the Hearing that "there was a decertification election that was filed" but that at that time, in 2022, "for whatever reason, the NLRB decided not to collect the votes because they thought that they might be somehow tainted" and that his understanding, though he was not a party to it, is that the NLRB "viewed the votes of the members to be tainted in some way because the management had somehow altered the population so that . . . the [U]nion would not be successful" and accordingly, the decertification petition was never completed.  (*Id.* at 23–25; *see also* Mov. Br. at 9–12); *see also infra* n.9.

[6]      Pin cites to D.E. No. 1-8 herein refer to the page numbers automatically generated by the Court's CM/ECF case management system.

[7]      Among other things, the GRIWA contained a "Successors & Assigns" clause in Article 54, which stated:

> This Agreement shall be binding upon the successors and assigns of the parties hereto, and no provisions, terms, or obligations herein contained shall be affected, modified, altered, or changed in any respect whatsoever by the consolidation, merger, sale, transfer, or assignment of either party hereto or affected, modified, altered or changed in any respect whatsoever by any change of any kind in the legal status, ownership, or management of either party hereto.  Any successor Employer shall assume all of the obligations under this Agreement of the prior operator of the facility or concession to the employees, the Union[,] or any of the funds to which Employer is required to contribute hereunder. . . . A successor, assign or transferee shall assume all obligations of the predecessor, assignor or transferor, including this agreement and those agreements and practices supplementing this Agreement.  Subject to Paragraph (D), every successor, assign and transferee shall execute an assumption agreement substantially similar to the following not less than ten (10) business days prior to any transfer or change covered by this Article.

(D.E. No. 1-8 at 230–31).

Almonte, and housekeepers Carlena Ponce, Asuncion Toribio, Ruth Ashitey, Carlena Mejia, Ramona Almonte de Valdez, and Flerida Sanchez[8] (collectively, the "Union Supporters"). (Mov. Br. at 5).

According to Petitioner, in the two years prior to ceding operations of the Hotel to Respondent (i.e., from approximately late 2021 through mid-2023), JSK committed numerous unfair labor practices as the operator of the Hotel including: (i) coercing employees to waive their rights to Union-provided health insurance; (ii) hiring employees to dissipate the Union's majority status; (iii) reducing the Union Supporters' hours; (iv) soliciting employees to sign a decertification petition[9]; (v) interrogating employees about their Union activity; (vi) surveilling employees engaged in Union activity; (vii) denying the Union access to represented employees at its facility; and (viii) refusing to provide the Union with requested information regarding the terms and conditions of employees in the unit.[10]  (*Id.* at 3; *see also* D.E. No. 1-1).

On March 31, 2023, the successor GRIWA expired.  (*See* Mov. Br. at 5; D.E. No. 1-8 at 241).  JSK and the Union did not meet prior to the GRIWA expiring, even though the Union had reached out to Mr. Patel back on January 30, 2023, to ask for available dates to bargain a successor

---

[8]    Flerida Sanchez is situated differently than the other Union Supporters in that she went out on medical leave beginning March 1, 2023, prior to when Respondent took over operations of the Hotel from JSK.  (Mov. Br. at 12).  Before her leave, Ms. Sanchez notified Mr. Jaffrey who filled out the paperwork to allow her to receive disability benefits.  (*Id.*).

[9]    On October 11, 2022, a petition was filed to decertify the Union, and a decertification election took place the morning of November 30, 2022.  (Mov. Br. at 11).  The NLRB ultimately dismissed this petition, though the record is silent as to the date of dismissal.  (*See id.*).  Petitioner notes that the NLRB "dismisses petitions where there is a finding that unfair labor practices would interfere with employee free choice in an election, and when a related unfair labor practice complaint is issued."  (*Id.* at 11 n.50 (citing *Rieth-Riley Constr. Co.*, 3710 N.L.R.B. 109, slip op. at *3 (2022))); *see also supra* n.5.

[10]    Neither party appears to dispute that JSK committed these alleged unfair labor practices.  Additionally, the present Petition does not concern these actions by JSK but rather solely relates to *Respondent's* alleged unfair labor practices.  (*See* Petition at 2 n.1 ("The Union also filed charges against Respondent's predecessor, JSK Parsippany, LLC d/b/a Fairfield Inn & Suites by Marriott (JSK). Since this matter does not seek injunctive relief against JSK, those charges are not included herein."); Mov. Br. at 2 n.3 ("Petitioner seeks injunctive relief only as to Respondent, not as to JSK."); Reply Br. at 8 ("In this proceeding, Petitioner seeks a remedy for unfair labor practices committed by Respondent, not JSK.")).

agreement to the GRIWA, prior to its expiration. (Mov. Br. at 12). Mr. Patel did not respond until approximately six weeks later, on March 13, 2023, when Mr. Jaffrey requested mediation on March 30, 2023, which was the day before the GRIWA was set to expire. (*Id.* at 12–13). To the Court's knowledge, this mediation never occurred.

A few months later, on or about July 18, 2023, Respondent purchased the business assets of JSK pursuant to an asset purchase agreement ("APA"), which contained indemnification provisions. (D.E. No. 1-7 at 3[11]; Mov. Br. at 14; Opp. Br. at 5; D.E. No. 7-2 at 63–97[12] (copy of APA)). About one month later, on August 17, 2023, Respondent entered into a "General Service Agreement" with Hotel Cleaning Services LLC ("HCS"[13]), a third-party entity that Respondent hired as a contractor to provide bargaining unit work for the Hotel and to hire/pay/manage/etc. the employees necessary to provide those services.[14] (D.E. No. 1-8 at 461–66 (copy of the agreement between Respondent and HCS); *see also* Mov. Br. at 14–15; Opp. Br. at 5–6). The next day, on August 18, 2023, Mr. Jaffrey notified the six then-working Union Supporters (excluding Ms. Sanchez who was temporarily out on medical leave at the time[15]) that they were terminated because the Hotel had been sold, and he provided them termination letters. (*See* Mov. Br. at 15–18; Opp. Br. at 6, 12, 15; Reply Br. at 2 & n.7). However, Respondent retained (or let go and rehired without

---

[11]    Pin cites to D.E. No. 1-7 herein refer to the page numbers automatically generated by the Court's CM/ECF case management system.

[12]    Pin cites to D.E. No. 7-2 herein refer to the page numbers automatically generated by the Court's CM/ECF case management system.

[13]    Record evidence reflects that HCS was formed by Elcira Sanchez on August 17, 2023, the same day that Respondent signed the contract with HCS. (*See* Mov. Br. at 14; D.E. No. 1-8 at 459–60). Record evidence also shows that Elcira Sanchez was involved in JSK's unfair labor practices, including hiring employees in 2022 to try and dissipate the Union's majority support. (*See* Mov. Br. at 36; *see also id.* at 8–9 & 11 n.50).

[14]    This agreement with HCS did not take effect immediately but rather was delayed until on or around December 24, 2024. (*See* Mov. Br. at 23; Opp. Br. at 12; Oct. 10, 2024 Hrg. Tr. at 26).

[15]    "[Ms.] Sanchez was on medical leave covered by long-term and/or short-term disability from on or about March 1, 2023 through November 14, 2023." (Petition at 6).

5

any delay) the other non-Union-supporting employees of JSK, i.e., the nine remaining Bargaining Unit Employees.[16]  (*See id.*).  The following day, on August 19, 2023, Respondent took over operations of the Hotel from JSK, pursuant to the APA, and the Hotel has operated continuously since its transfer from JSK to Respondent.  (Mov. Br. at 16; D.E. No. 1-7 at 3).  When Respondent took over operations of the Hotel, Zia Jaffrey remained (and, to the Court's knowledge, remains to this day) as general manager of the Hotel.  (Mov. Br. at 3–5).

About two days later, on August 21, 2023, the Union notified Respondent that terminating the Union Supporters "violated New Jersey Statute § 29:4-13, which requires, *inter alia,* that hotels retain all hotel service employees for no less than 90 working days after a change in control, controlling interest, or employer identity, and provide current employees notice of their rights under the law."[17]  (Petition at 6; *see also* Mov. Br. at 18).  The next day, August 22, 2023,

---

[16]    The parties appear to dispute who was terminated on August 18, 2023.  Petitioner argues that only the Union Supporters were terminated on that day (*see* Mov. Br. at 15 ("The termination letters, signed by [Mr.] Jaffrey on behalf of JSK, state that all JSK employees were terminated as of August 18[, 2023,] in accordance with the sale of the Hotel to Respondent[,]" but "there is no record evidence that any other employees were notified that they were terminated on this date."); *id.* at 15–18; Reply Br. at 2 & n.7 (stating that "Respondent admits that since August 19,[ 2023,] it has operated the [H]otel continuously in the same manner as it had been operated by JSK"; "Respondent further admits that on August 19, it employed a majority of JSK's former bargaining unit employees"; and "Respondent's argument, on page 15 of its brief, that it is not a *Burns* successor because '[it] terminated all the prior employees with the intention of subcontracting their services' is contradicted by its own admissions and record evidence").  However, Respondent contends, without citing to record evidence, that all former JSK employees were fired, not just the Union Supporters. (*See* Opp. Br. at 12, 15 ("When [Respondent] completed the purchase of the assets of JSK, it terminated all employees, including 'non-union' housekeepers as verified by the testimony of numerous housekeepers at the hearing. . . .  In this case, [Respondent] terminated all the prior employees with the intention of subcontracting their services.")).  But Respondent stipulated to the following fact: "*On August 19, 2023, Respondent Fairfield took over operations of the [H]otel from Respondent JSK.  Between August 19, 2023 and August 21, 2023, bargaining unit employees Krsytal [sic] Basulto, Noreen Basulto, Stephanie Bembridge, Hansaben Nakrani, Tulsibhai Nakrani, Champakla Patel, Meenaxibe Patel, Natverlad Lad and Chetnakumari Lad performed housekeeping and breakfast attending work.*" (D.E. No. 1-7 at 3 (emphasis added)).  Thus, even assuming all former JSK employees were indeed terminated on August 18, 2023 (i.e., the day before Respondent took over Hotel operations from JSK), it is undisputed that on the next day, August 19, 2023, when Respondent took over Hotel operations from JSK, Respondent employed all former JSK employees except for the Union Supporters.  Three days later, on August 22, 2023, Respondent hired back the six then-working Union Supporters (excluding Ms. Sanchez) for a ninety-day probationary period to comply with N.J. Stat. Ann. § 29:4-13, but following that ninety-day probationary period, Respondent subsequently terminated the Union Supporters on December 8, 2023.  (*See* D.E. No. 1-7 at 4; Mov. Br. at 18–19, 22–23, 32, 37–38; Reply Br. at 3–4, 3 n.9, 8).

[17]    The Union was neither given advance notice of the terminations of the Union Supporters nor of the transfer from JSK to Respondent.  (Mov. Br. at 14–15).

Respondent hired back the six then-working Union Supporters as probationary employees for ninety working days. (Petition at 6; D.E. No. 1-7 at 4; Mov. Br. at 18–19). On or about November 1, 2023, Respondent refused Ms. Sanchez's request to be reinstated as an employee of the Hotel. (Petition at 6; D.E. No. 1-7 at 4). On or about December 8, 2023, Respondent terminated the six then-working Union Supporters. (*Id.*). It is undisputed that after December 8, 2023, Respondent did not hire the six then-working Union Supporters, nor did Respondent ever reinstate Ms. Sanchez. (*See* Oct. 10, 2024 Hrg. Tr. at 67–70; Petition at 6; Mov. Br. at 22–24; Opp. Br. at 12). Rather, on or around December 24, 2023, the HCS contract went into effect, and accordingly, Respondent's position is that it currently does not employ any of JSK's former employees because the remaining former JSK employees (excluding the Union Supporters) who currently work at the Hotel are technically employees of HCS, not Respondent. (*See id.*; *see also* Mov. Br. at 22–24, 37–40; Opp. Br. at 12–13; Reply Br. at 4 & n.14).

### B.    Procedural History

In the underlying NLRB proceedings, Sullivan, on behalf of the General Counsel for the NLRB, issued a Second Amended Consolidated Complaint and Notice of Hearing on April 9, 2024, alleging that JSK and Respondent, as JSK's alleged successor, committed unfair labor practices in violation of Sections 8(a)(1), 8(a)(3) and 8(a)(5) of the NLRA. (*See generally* D.E. No. 1-8 at 136–51 ("Complaint")). Soon thereafter, NLRB Administrative Law Judge ("ALJ") Susannah Merritt ("ALJ Merritt") held an administrative hearing—on May 1, 2, 6, 7, and June 6, 2024—on the unfair labor practices alleged in the Complaint. (Mov. Br. at 1; D.E. Nos. 1-2 through 1-6 (ALJ hearing transcripts)). JSK did not respond to the Complaint nor appear for the hearing before ALJ Merritt, and on May 29, 2024, ALJ Merritt issued an order granting a motion for default judgment against JSK, finding that JSK had violated the NLRA as alleged in the

Complaint.  (D.E. No. 1-1; *see also* Mov. Br. at 1–2; Opp. Br. at 3 & 13).

On July 29, 2024, the NLRB authorized Petitioner to seek injunctive relief pursuant to Section 10(j) of the NLRA regarding the Complaint allegations against Respondent.[18]  (Mov. Br. at 2).  On August 12, 2024, Petitioner filed a Petition for Temporary Injunction Under Section 10(j) of the NLRA in this Court.  (*See generally* Petition; *see also* Mov. Br.).  On that same day, Petitioner also separately filed a "Motion to Try the Likelihood of Success on the Merits Portion of the Petition for Temporary Injunction Under Section 10(j) of the [NLRA] on the Basis of the Record in the Underlying Unfair Labor Practice Hearing and Request for Expedited Briefing and Disposition of this Motion."  (D.E. No. 3).

Among other things, Petitioner alleges that in violation of Sections 8(a)(1), 8(a)(3), and 8(a)(5) of the NLRA, Respondent: (i) "hired all of JSK's employees except those who supported the Union"; (ii) "refused to recognize and bargain with the Union"; (iii) "unilaterally changed terms and conditions of employment"; (iv) "refused to allow the Union access to its facility to meet with employees"; and (v) "refused to provide the Union information" that it requested.  (Mov. Br. at 2).  Accordingly, Petitioner seeks to enjoin Respondent from:

> (i) "[r]efusing to hire, refusing to reinstate, or discharging employees because they engaged in union activities";
>
> (ii) "[f]ailing and refusing to recognize and bargain in good faith with the Hotel and Trading Games Council, AFL-CIO (Union) as the exclusive-bargaining representative of all full-time and regular part-time maintenance techs, breakfast hosts, housemen and housekeepers employed by Respondent at its facility located at 3535 U.S. Highway 46, Parsippany, New Jersey";
>
> (iii) "[u]nilaterally changing employees' terms and conditions of employment";

---

[18]    Petitioner is only seeking Section 10(j) injunctive relief as to Respondent, not as to JSK.  (*See* Petition at 2 n.1 (stating "this matter does not seek injunctive relief against JSK"); Mov. Br. at 2 n.3 ("Petitioner seeks injunctive relief only as to Respondent, not as to JSK."); Reply Br. at 8 ("In this proceeding, Petitioner seeks a remedy for unfair labor practices committed by Respondent, not JSK.")).

(iv) "[f]ailing and refusing to apply to unit employees the terms and conditions of employment that were in place prior to Respondent's assumption of [H]otel operations";

(v) "[f]ailing and refusing to provide requested information to the Union that is necessary and relevant to its role as collective-bargaining representative of the unit employees"; and

(vi) otherwise "unlawfully interfering with, restraining, or coercing employees in the exercise of the rights guaranteed to them under Section 7 of the Act."

(Petition at 11–12).

On August 14, 2024, the Court issued an Order to Show Cause ("OTSC") as to why a temporary injunction should not issue against Respondent pending the final disposition of the underlying NLRB proceedings, set forth an expedited briefing schedule for the Petition, and scheduled a show cause hearing for September 30, 2024.  (D.E. No. 4).  On August 20, 2024, Petitioner filed an affidavit of service on the docket, reflecting that it served Respondent on August 16, 2024, with a copy of the Petition, the motion papers, and the OTSC.  (D.E. No. 6).  On August 30, 2024, Respondent filed an opposition to the Petition (Opp. Br.), and on September 6, 2024, Petitioner filed a reply (Reply Br.).  On September 20, 2024, the Court rescheduled the show cause hearing to October 10, 2024.  (D.E. No. 9).  On October 3, 2024, the Court granted Petitioner's unopposed "Motion to Try the Likelihood of Success on the Merits Portion of the Petition for Temporary Injunction Under Section 10(j) of the [NLRA] on the Basis of the Record in the Underlying Unfair Labor Practice Hearing and Request for Expedited Briefing and Disposition of this Motion."  (D.E. No. 15).  On October 10, 2024, the Court held a show cause hearing on the Petition.  (*See* D.E. No. 17; Oct. 10, 2024 Hrg. Tr.).

On November 21, 2024, Petitioner filed a letter notifying the Court that on November 19,

2024, ALJ Merritt issued her decision in the underlying NLRB proceedings.[19]  (D.E. No. 18).

Petitioner states "ALJ Merritt found that Respondent violated Section 8(a)(1) and (3) of the

[NLRA] by refusing to hire six housekeeping and maintenance employees and then terminating

those employees on December 8, 2023" and "also found that Respondent was a successor under

*NLRB v. Burns International Security Services*, 406 U.S. 272, 281 (1972), with an obligation to

recognize and bargain with the Union[.]"  (*Id.* at 1).  Petitioner notes that ALJ Merritt also found

that by failing to fulfill its obligation to bargain with the Union, "Respondent violated Section

8(a)(1) and (5) of the [NLRA] through unilaterally changing terms and conditions of employment

and refusing to provide the Union information[,]" but that she "did not find merit to the allegation

that Respondent violated Section 8(a)(1) and (3) of the [NLRA] by refusing to reinstate Flerida

Sanchez." (*Id.*).  Petitioner asserts that ALJ Merritt's decision "does not moot the need for interim

relief in this case, as it is not the end of the administrative process."  (*Id.* at 2 (first citing *Schaub*

*v. W. Mich. Plumbing & Heating, Inc.*, 250 F.3d 962, 968 (6th Cir. 2001); and then citing *Sharp*

*v. Webco Indus.*, 225 F.3d 1130, 1136 (10th Cir. 2000))).  Rather, Petitioner submits an ALJ's

decision is a recommendation to the NLRB, which issues the final administrative determination.

(*See id.*).  However, Petitioner stated it would limit its proposed injunctive order to only those

allegations the ALJ found to be meritorious—specifically, by "removing the requirement to cease

and desist from refusing to reinstate in paragraph 1(a) and deleting Flerida Sanchez from

paragraphs 2(a) and (l)" of the proposed order.  (*Id.*).  Accordingly, Petitioner attached a revised

proposed order to its letter, incorporating these changes.  (D.E. No. 18-2).

On November 25, 2024, Respondent submitted a letter in response to Petitioner's

November 21, 2024 letter, stating ALJ Merritt's decision "is an interim decision and may not be

---

[19]     Petitioner attached a copy of ALJ Merritt's decision to its letter.  (*See* D.E. No. 18-1).

representative of the [NLRB's] final decision." (D.E. No. 19 at 1). Respondent also reiterated its argument that injunctive relief is not warranted here and requested that Petitioner withdraw its requested Section 10(j) injunctive relief. (*Id.* at 1–2).

## II.    LEGAL STANDARD

Section 10(j) "enables the [NLRB] or its designated agent to seek interim injunctive relief from a federal district court pending the [NLRB's] own administrative adjudication of an unfair labor practice complaint." *Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076, 1078 (3d Cir. 1984). The underlying purpose of Section 10(j) "is to protect the integrity of the collective bargaining process and to preserve the [NLRB's] remedial power while it processes the charge." *Hooks ex rel. NLRB v. Nexstar Broad., Inc.*, 54 F.4th 1101, 1107 (9th Cir. 2022) (citation omitted).

Specifically, Section 10(j) of the NLRA provides that the NLRB:

> shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order.

29 U.S.C. § 160(j) ("Section 10(j)"). Section 10(j) further provides that "[u]pon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the [NLRB] such temporary relief or restraining order as it deems just and proper." *Id.*

"As with all preliminary injunctions, a [Section] 10(j) determination does not result in an 'adjudication on the merits but rather [is] a device for preserving the status quo and preventing the irreparable loss of rights before [a] judgment' that will be issued by the NLRB after an unfair labor

practices hearing." *Overstreet v. One Call Locators Ltd.*, 46 F. Supp. 3d 918, 923 (D. Ariz. 2014)

(quoting *Sierra On–Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984)).

**A.    Recent Change to the Legal Standard Governing Section 10(j) Injunctions in the Third Circuit**

Prior to June 13, 2024, a circuit split existed over which standard courts had to use in

determining whether to issue a Section 10(j) injunction. *See Starbucks Corp. v. McKinney*, 144 S.

Ct. 1570 (2024). Some circuits were using the traditional four-factor preliminary injunction test

articulated in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)—i.e., asking

(i) whether the petitioner is likely to succeed on the merits, (ii) whether petitioner is likely to suffer

irreparable harm in the absence of preliminary relief, (iii) whether the balance of equities tips in

petitioner's favor, and (iv) whether an injunction is in the public interest. *See, e.g.*, *Frankl v. HTH

Corp.*, 650 F.3d 1334, 1355 (9th Cir. 2011). Whereas, other circuits, including the Third Circuit,

were using a lower two-prong standard in determining whether to grant a Section 10(j)

injunction—i.e., asking (i) whether there is reasonable cause to believe that an unfair labor

practice(s) has occurred, and (ii) whether the injunctive relief sought is "just and proper." *See,

e.g.*, *Chester ex rel. NLRB v. Grane Healthcare Co.*, 666 F.3d 87, 89 (3d Cir. 2011).

On June 13, 2024, the Supreme Court issued its opinion in *Starbucks Corporation v.

McKinney*, resolving this circuit split and holding that district courts must apply the traditional

four-factor preliminary injunction test articulated in *Winter* when determining whether to issue a

Section 10(j) injunction sought by the NLRB. *Starbucks*, 144 S. Ct. at 1579. Specifically, under

*Winter*, a petitioner "seeking a preliminary injunction must establish [i] that he is likely to succeed

on the merits, [ii] that he is likely to suffer irreparable harm in the absence of preliminary relief,

[iii] that the balance of equities tips in his favor, and [iv] that an injunction is in the public interest."

*Winter*, 555 U.S. at 20. The Supreme Court reasoned that "because nothing in [Section] 10(j)'s

text overcomes the presumption that traditional equitable principles govern, district courts considering the [NLRB]'s request for a preliminary injunction must apply the *Winter* framework, which embodies those traditional principles." *Starbucks*, 144 S. Ct. at 1577.  In so holding, the Supreme Court overruled the lower two-prong standard previously used in the Third Circuit, and accordingly, this Court will apply the traditional four-factor preliminary injunction test articulated in *Winter* in determining whether Petitioner is entitled to Section 10(j) injunctive relief.[20]

### B.     Preliminary Injunction Legal Standard

"A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.'" *Starbucks*, 144 S. Ct. at 1576 (quoting *Winter*, 555 U.S. at 24).  "Its purpose 'is merely to preserve the relative positions of the parties until a trial on the merits can be held.'" *Id.* (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  A "[petitioner] seeking a preliminary injunction must make a clear showing that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Id.* (quoting *Winter*, 555 U.S. at 20).  In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)).

A party must produce sufficient evidence of all four factors and the Court must weigh them prior to granting injunctive relief.  *See Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994) (citation omitted).  However, "as a practical matter, if a [petitioner] demonstrates both a likelihood of success and irreparable injury, it almost always will

---

[20]     At the Hearing, counsel for Petitioner and counsel for Respondent agreed that this is the correct legal standard to use in determining Section 10(j) injunctions.  (*See* Oct. 10, 2024 Hrg. Tr. at 13–14).

be the case that the public interest will favor the [petitioner]." *Id.* at 1427 n.8. "The movant bears the burden of showing that these four factors weigh in favor of granting the injunction." *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014).

## III.    DISCUSSION

The Court addresses each of the four *Winter* factors in analyzing the instant Petition for Section 10(j) injunctive relief.

### A.    Likelihood of Success on the Merits

To meet the first prong of the four-part preliminary injunction test, the petitioner need only "make a showing of reasonable probability, not the certainty, of success on the merits." *Beilowitz v. Gen. Motors Corp.*, 233 F. Supp. 2d 631, 639 (D.N.J. 2002) (citation omitted). "In the specific context of Section 10(j) petitions for an injunction, the likelihood of success on the merits is 'a function of the probability that the [NLRB] will issue an order determining that the unfair labor practices alleged by the Regional Director occurred'" and further "that the reviewing court will 'grant a petition enforcing that order, if such enforcement were sought.'" *Overstreet v. Lucid USA Inc.*, No. 24-1356, 2024 WL 4186825, at *5 (D. Ariz. Sept. 13, 2024) (quoting *Frankl*, 650 F.3d at 1355). "The Court lacks jurisdiction to determine the merits of the underlying labor dispute pending before the [NLRB], and consequently, any injunctive relief entered terminates by operation of law on the issuance of the [NLRB's] final administrative ruling." *Harrell v. Nat'l Red Cross, Heart of Am. Blood Servs. Region*, No. 11-1284, 2011 WL 3951860, at *1 (C.D. Ill. Sept. 7, 2011) (citing *Barbour v. Cent. Cartage, Inc.*, 583 F.2d 335 (7th Cir. 1978)). "Accordingly, the Court's inquiry is limited to a determination of whether the evidence presented, when viewed in the light most favorable to Petitioner, could be resolved by the [NLRB] in favor of Petitioner." *Id.* "The Regional Director in a Section 10(j) proceeding can make a threshold showing of

likelihood of success on the merits 'by producing some evidence to support the unfair labor practice charge, together with an arguable legal theory.'" *Overstreet*, 2024 WL 4186825, at *5 (quoting *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1187 (9th Cir. 2011)). "Conflicting evidence 'does not preclude the Regional Director from making the requisite showing for a section 10(j) injunction.'" (*Id.* (quoting *Frankl*, 693 F.3d at 1063)).

Here, the Court must assess whether Petitioner is likely to succeed on the merits of (i) establishing that Respondent is a "successor" to JSK under *Burns* and its progeny, and (ii) establishing that Respondent violated Sections 8(a)(1), 8(a)(3), and 8(a)(5) of the NLRA. The Court discusses each of these in turn.

### i. Whether Petitioner is Likely to Succeed on the Merits of Establishing That Respondent is a Successor to JSK Under *Burns* and Its Progeny

In *NLRB v. Burns International Security Services, Inc.*, the Supreme Court held that a successor employer, which had hired a majority of its predecessor's work force and maintained substantially intact its predecessor's operational structures and practices, had an obligation to recognize and bargain with the union representing the predecessor's employees but was not bound by the substantive provisions of a collective-bargaining agreement negotiated by the predecessor but not agreed to or assumed by the successor. 406 U.S. 272, 278–82 (1972). Courts have employed a two-part test to determine whether an employer is a successor employer under *Burns* and its progeny who is "obligated to recognize and bargain with a union representing the predecessor's employees," specifically "when (1) there is a substantial continuity of operations, and (2) a majority of the new employer's work force, in an appropriate unit, consists of the predecessor's employees." *Always E. Transp., Inc. & Int'l Bhd. of Teamsters, Loc. 445*, 365 N.L.R.B. 71, at *3 (May 11, 2017) (first citing *Burns*, 406 U.S. at 272; and then citing *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27 (1987)). This analysis "is primarily factual in

nature and is based upon the totality of the circumstances of a given situation" and requires that the NLRB "focus on whether the new company has 'acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations.'" *Fall River*, 482 U.S. at 43 (quoting *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 184 (1973)). "Hence, the focus is on whether there is 'substantial continuity' between the enterprises." *Id.*

In determining whether there is "substantial continuity" between the enterprises, the NLRB examines a number of factors including: (i) "whether the business of both employers is essentially the same"; (ii) "whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors"; and (iii) "whether the new entity has the same production process, produces the same products, and basically has the same body of customers." *Id.*; *Allways E. Transp., Inc.*, 365 N.L.R.B. 71, at *3 (citing *Fall River*, 482 U.S. at 43); *see also Lab. Plus, LLC, & Its Successor Wynn Las Vegas, LLC & Wynn Las Vegas, LLC Lab. Plus, LLC, & Its Successor Wynn Las Vegas, LLC & Int'l All. of Theatrical Stage Emps. & Moving Picture Technicians, Artists & Allied Crafts of the U.S. & Canada Loc. Union 720 (Iatse)*, 366 N.L.R.B. 109, at *4 (June 14, 2018). "Most importantly, these factors are to be analyzed from the perspective of the employees, i.e., whether they 'understandably view their job situations as essentially unaltered.'" *Allways E. Transp., Inc.*, 365 N.L.R.B. 71, at *3 (quoting *Fall River*, 482 U.S. at 43). "When a new employer . . . has acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations, those employees who have been retained will understandably view their job situations as essentially unaltered," and "[u]nder these circumstances, the employees may well perceive the successor's failure to remedy the predecessor employer's unfair labor practices arising out of an unlawful discharge as a continuation of the predecessor's labor policies." *Golden State Bottling*, 414 U.S.

at 184; *see also Chi. Dist. Council of Carpenters Pension Fund v. A.F. McCarthy, Inc.*, No. 94-6881, 1996 WL 563459, at *6 (N.D. Ill. Sept. 30, 1996) ("There is a line of cases which impose liability for a predecessor's unfair labor practices on a successor if there has been both a complete transfer of assets and the successor had notice of the liability before the sale. . . . This form of successor liability has been broadened to encompass not only outright sales of a business but any reorganization that results in a substantial continuation of the business by the successor and either obliterates the previous business or leaves it as an 'empty shell'.  Thus[,] successor liability may lie where the transaction is a consolidation or similar restructuring, the purchaser is a 'mere continuation' of the seller or the transfer of assets is for a fraudulent purpose." (citations omitted)).

Turning to the second factor, in determining whether the predecessor employees constitute a majority of the new employer's workforce, the NLRB assesses whether and when the predecessor employees constitute a majority of the new employer's workforce in a "substantial and representative complement."  *Fall River*, 482 U.S. at 47–49.  If "a majority of the successor's employees had been employed by its predecessor, then the successor has an obligation to bargain with the union that represented these employees."  *Id.* at 47.  In deciding when a "substantial and representative complement" exists in a particular employer transition, the NLRB examines a number of factors including "whether the job classifications designated for the operation were filled or substantially filled and whether the operation was in normal or substantially normal production."  *Id.* at 48–49 (citing *Premium Foods, Inc. v. NLRB*, 709 F.2d 623, 628 (9th Cir. 1983)).

Additionally, the Supreme Court has observed that, although a successor has an obligation to bargain with the union, it "'is ordinarily free to set initial terms on which it will hire the employees of a predecessor,' and it is not bound by the substantive provisions of the predecessor's

collective-bargaining agreement." *Id.* at 40 (quoting *Burns*, 406 U.S. at 284, 294). The Supreme Court "further explained that the successor is under no obligation to hire the employees of its predecessor, subject, of course, to the restriction that it not discriminate against union employees in its hiring[,]" and therefore, "[i]f the new employer makes a conscious decision to maintain generally the same business and to hire a majority of its employees from the predecessor, then the bargaining obligation of § 8(a)(5) is activated." *Id.* at 40–41 (citations omitted); *see also Lab. Plus, LLC*, 366 N.L.R.B. 109, at *4 ("A new employer assumes an obligation to bargain with the union representing employees of its predecessor if the new employer is a legal successor to the old employer, and hires a majority of the predecessor's work force." (citations omitted)). "The 'essence of successorship,' however, 'is not premised on an identical re-creation of the predecessor's customers and business, but rather, on the new employer's "conscious decision to maintain generally the same business and to hire a majority of its employees from the predecessor" in order "to take advantage of the trained work force of its predecessor."'" *Always*, 365 N.L.R.B. 71, at *3 (quoting *A. J. Myers & Sons, Inc.*, 362 N.L.R.B. 51, slip op. at 7 (2015)). "The [NLRB] has never held that the [NLRA] itself requires that an employer who submits the winning bid for a service contract or who purchases the assets of a business be obligated to hire all of the employees of the predecessor though it is possible that such an obligation might be assumed by the employer." *Burns*, 406 U.S. at 280 n.5. However, "an employer who declines to hire employees solely because they are members of a union commits a § 8(a)(3) unfair labor practice." *Id.*

Here, Petitioner argues it is likely to succeed on the merits of establishing that Respondent became a successor employer to JSK, under *Burns* and its progeny, on August 19, 2023, because Petitioner: (i) can show that Respondent continued to provide the same hotel services JSK provided, without interruption, "continued operating as a Fairfield Inn & Suites by Marriott,"

"maintained the same management," and "unit members performed the same work they had previously performed"; and (ii) "the evidence conclusively establishes that on August 19, [2023,] Respondent hired all of JSK's former unit employees except the six Union [S]upporters, which is a majority of the unit."[21]  (Mov. Br. at 26–31; Reply Br. at 1–5).  Accordingly, Petitioner contends Respondent became a successor employer to JSK on August 19, 2023, and, as such, is obligated to recognize and bargain with the Union.  (Mov. Br. at 31).

Additionally, Petitioner argues that New Jersey's Hotel Worker Retention Statute, N.J. Stat. Ann. § 29:4-13—which requires successor hotel employers to "offer each eligible hotel service employee employment for no less than 90 working days under the terms and conditions established by the successor hotel employer, with no reduction of wages or benefits . . . and shall not be lower than any rate required by law"—does not affect the successor analysis because Respondent admits it had no knowledge of the New Jersey retention statute on August 19, 2023, when it took over operations from JSK and made its initial hiring decisions and elected to hire nine

---

[21]     Petitioner states the bargaining unit had 15 employees on August 18, 2023, JSK's last day of Hotel operations, and that Respondent hired 10 of those 15 employees (including Ms. Sanchez, or 9, excluding Ms. Sanchez) when it took over Hotel operations from JSK. (Mov. Br. at 17).  Accordingly, Petitioner states the record evidence "establishes that Respondent hired a majority of the unit members on August 19[, 2023]." (*Id.*; *see also* Reply Br. at 2 & n.6).  In opposition, Respondent states: "[t]here are approximately 12 employees in the unit that are the subject of this litigation" but contends, without citing to record evidence, that "[e]xcept for the limited 'probationary period' of 90 days, [it] has not employed any of JSK's former employees" and that it terminated "everyone" when it took over from JSK because it "intended to subcontract all of its hospitality services pursuant to an agreement with [HCS]." (Opp. Br. at 5, 12).  Respondent further argues "the number of employees who expressed the desire not to be members of the Union represented a majority of the entire workforce employed by JSK" and that "based upon their testimony, the majority of the workforce would not vote for union membership." (*Id.* at 19).  In support of this argument, Respondent cites to one exhibit in the record—a letter dated February 27, 2024 (more than six months *after* Respondent took over Hotel operations from JSK), that appears to be a letter addressed to the Union, signed by eight Hotel employees, stating essentially that they no longer wish to be part of the Union (*id.* at 7; D.E. No. 1-9 at 105), though it is not clear this letter was ever submitted to the Union, and if so, when, and/or whether the Union Supporters had an opportunity to see this letter.  Apparently relying on this letter, Respondent asserts "that a majority of JSK's employees, now employed by [HCS], were disinterested in being members of the [U]nion." (Opp. Br. at 7 (citing D.E. No. 1-9 at 105)).  In reply, Petitioner states that Respondent's assertion that there are 12 employees in the bargaining unit is not supported by any evidence.  (Reply Br. at 2 n.6).  Petitioner further contends that "[c]ontrary to Respondent's assertions, it did not terminate all of JSK's employees and then re-hire them" but rather "the record shows that on August 18,[ 2023,] JSK notified the six Union [S]upporters [excluding Ms. Sanchez] that they were terminated" and that the nine "remaining unit employees continued to work without a break in service." (*Id.* at 3–4).  Petitioner also states there is evidence of Union animus on Respondent's part.  (*See* Mov. Br. at 36–37; Reply Br. at 5).

of the Bargaining Unit Employees, maintaining a majority of JSK's employees. (*Id.* at 31–32; *see also* Reply Br. at 8). Petitioner also argues that indemnification does not release Respondent from liability because "[a] union's right to recognition and a successor employer's obligation to recognize and bargain are statutory, not contractual, and the union's waiver of that statutory right must be clear and unmistakable." (Mov. Br. at 33). Petitioner further argues that since the Union was not a party to the asset purchase agreement between Respondent and JSK, it "cannot have waived its statutory right to recognition under *Burns*" and that the NLRB is "not bound by private agreements of this type, which limit the exercise of its remedial powers in the public interest." (*Id.* (first citing *Cnty. Agency Inc. & Esplanade Partners Ltd.*, 369 N.L.R.B. 62, slip op. at *2 (2020), *enforced mem.*, No. 20-1522, 2021 WL 1941820 (2d Cir. 2021); and then citing *Kelly Servs. Inc.*, 368 N.L.R.B. 130, slip op. at *4 (2019))).

In opposition, Respondent argues it is not a successor to JSK because it only purchased the business assets of JSK in an arms-length transaction and did not assume any of JSK's liabilities. (*See generally* Opp. Br.). Respondent states that at the time of purchase, JSK made it aware that there was an expired collective-bargaining agreement with the Union, and Respondent asserts it made clear in the purchasing agreements "that it was not assuming any of the liabilities of JSK in the 'assets only' sale and that the sale was subject to its indemnification against any liabilities of JSK." (*Id.* at 3). Respondent contends it "had no direct knowledge of JSK's obligations and relied upon its indemnifications and other representations in agreeing to the purchase and sales contract of JSK's assets and its parent's purchase of the real property" and that it "would have not completed the sale without the indemnifications." (*Id.*). According to Respondent, it is an innocent, third-party purchaser of business assets from a hotel operator who did not assume JSK's liabilities, nor did it assume JSK's obligations to the Union or its former employees. (*Id.* at 11).

Respondent states it would be "inequitable to place [its] economic life at risk to compensate for JSK's wrongdoing" and that it "should be permitted conduct its business as intended in the purchase and sale documents which do not violate the law." (*Id.* at 11). Respondent contends it "specifically obtained indemnification from [JSK] for its prior acts" and that "there was a prior expired contract to which [it] did not subscribe[.]" (*Id.* at 19). Respondent also states "that a majority of JSK's employees, now employed by [HCS], were disinterested in being members of the [U]nion." (*Id.* at 7 (citing D.E. No. 1-9 at 105[22])).

Additionally, Respondent asserts that it never intended to be a "successor" business to JSK but rather intended to be "a new operator with a substantially different management model." (*Id.* at 3). Respondent argues that it "intended to subcontract all of its hospitality services pursuant to an agreement with [HCS]" and accordingly terminated everyone, not just the Union-supporting employees.[23] (*Id.* at 12). Respondent states HCS is the employer of the hospitality services employees at the Hotel, and nothing is preventing the HCS employees from organizing and forming a labor organization if they so choose, and Respondent asserts it has no interest in whether HCS employees are organized or not. (*Id.* at 11, 15). However, Respondent also states that "[u]nion recognition and bargaining are antithetical to [its] operational plan which calls for the subcontracting of service employees." (*Id.* at 15). Respondent argues that because it is not the successor, guarantor, or alter ego of JSK, as defined by the NLRA and applicable case law, the charges against it should be dismissed. (*Id.* at 7).

The Court finds that Petitioner is likely to succeed on the merits of establishing that

---

[22]     Pin cites to D.E. No. 1-9 herein refer to the page numbers automatically generated by the Court's CM/ECF case management system.

[23]     Petitioner disputes that Respondent terminated all of JSK's employees and maintains Respondent only terminated the Union Supporters but kept on the remaining nine bargaining unit employees from JSK. (Reply Br. at 3–4).

Respondent is a successor to JSK under *Burns* and its progeny because both prongs of the two-part test used to determine successorship are met here. As to the first prong, it is undisputed there was a substantial continuity of operations between JSK and Respondent in terms of operating the Hotel. For example, Respondent continued providing, without pause, the same hotel services provided by JSK and continued operating as a Fairfield Inn & Suites by Marriott; Respondent's employees are doing the same jobs as under JSK and have the same general manager, Mr. Jaffrey; and Respondent essentially has the same body of customers as JSK. As to the second prong, a majority of Respondent's workforce, in an appropriate bargaining unit, consists of JSK's former employees. The record evidence reflects that on August 18, 2023 (JSK's last day of operations at the Hotel before Respondent took over), there were fifteen Bargaining Unit Employees that the Union represented—i.e., the six then-working Union Supporters (minus Ms. Sanchez who was out on medical leave at the time), plus the nine other former JSK employees who were retained (or rehired) by Respondent on August 19, 2023. (*See* Mov. Br. at 15). Respondent does not dispute that the nine latter employees were working for Respondent at the Hotel on August 19, 2023. (*See* D.E. No. 1-7 at 3). Additionally, at the Hearing, Respondent's counsel essentially conceded that it hired a majority of the Bargaining Unit Employees/JSK's former employees on August 19, 2023. (*See* Oct. 10, 2024 Hrg. Tr. at 28–29).

As Petitioner's counsel stated at the Hearing, the Union represents everyone in the bargaining unit (i.e., all the Bargaining Unit Employees), whether or not they support the Union, and following certification, it is presumed the Union maintains its majority unless a decertification petition is lawfully filed. (*See id.* at 18–21). Thus, the Union represented all fifteen Bargaining Unit Employees on August 19, 2023, when Respondent took over Hotel operations from JSK. At the Hearing, Respondent's counsel mentioned "there was a decertification election that was filed,"

but at that time (back in 2022), "for whatever reason, the NLRB decided not to collect the votes because they thought that they might be somehow tainted" and that his understanding, though he was not a party to it, is that the NLRB "viewed the votes of the members to be tainted in some way because the management had somehow altered the population so that . . . the [U]nion would not be successful" and accordingly, the decertification petition was never completed.  (*Id.* at 23–25; *see also* Mov. Br. at 9–12).  Absent additional record evidence not presently before this Court, the Court is constrained to presume that the Union represented the Bargaining Unit Employees on August 19, 2023, when Respondent took over Hotel operations from JSK and retained (or rehired) a majority of the Bargaining Unit Employees.  This presumption is irrespective of whether the Bargaining Unit Employees supported the Union at that time because the Union had not been decertified and the prior decertification petition was dismissed.  Moreover, as far as the Court is aware, Respondent, through HCS, continues to employ a majority of JSK's former employees (minus the Union Supporters) to date.  Accordingly, Petitioner is likely to succeed on the merits of establishing that Respondent is a successor to JSK under *Burns* and its progeny, and as such, is obligated to recognize and bargain with the Union pending a final adjudication by the NLRB.[24]

> **ii.    Whether Petitioner is Likely to Succeed on the Merits of Establishing that Respondent violated Sections 8(a)(1), 8(a)(3), and 8(a)(5) of the NLRA**

"The NLRA makes it unlawful for an employer to engage in unfair labor practices, including the failure to bargain in good faith."  *Hooks*, 54 F.4th at 1106 (citing 29 U.S.C. § 158).  Section 7 of the NLRA provides that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their

---

[24]    This conclusion is supported by ALJ Merritt's decision finding that Respondent "was clearly a *Burns* successor to JSK" and, as such, had an obligation to recognize and bargain with the Union.  (*See* D.E. No. 18-1 at 17–19).

own choosing, and to engage in other concerted activities for the purpose of collective-bargaining or other mutual aid or protection[.]"  29 U.S.C. § 157.  Section 8(a)(1) of the NLRA provides: "It shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7 of the NLRA.]"  29 U.S.C. § 158(a)(1).

Section 8(a)(3) of the NLRA provides: "It shall be an unfair labor practice for an employer . . . by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."  29 U.S.C. § 158(a)(3).  Section 8(a)(3) further provides:

> [N]o employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership.

29 U.S.C. § 158(a)(3).

Section 8(a)(5) of the NLRA provides: "It shall be an unfair labor practice for an employer . . . to refuse to bargain collectively with the representatives of his employees, subject to the provisions of [Section 9 of the NLRA]."  29 U.S.C. § 158(a)(5).

Here, Petitioner argues it is likely to succeed on the merits of showing that Respondent violated Sections 8(a)(1), 8(a)(3), and 8(a)(5) of the NLRA based on the record evidence in the underlying NLRB proceedings.  (Mov. Br. at 26, 33–45; Reply Br. at 11–12; *see also* D.E. Nos. 1-2 through 1-9).  Specifically, Petitioner argues there is a likelihood that the NLRB will find: (i) that Respondent violated Sections 8(a)(1) and 8(a)(5) of the NLRA by refusing to recognize and bargain with the Union; (ii) that Respondent violated Sections 8(a)(1) and 8(a)(3) of the NLRA by

refusing to hire (and later terminating) the Union Supporters and refusing to reinstate Ms. Sanchez; (iii) that Respondent violated Sections 8(a)(1), 8(a)(3), and 8(a)(5) of the NLRA by implementing unilateral changes to the terms and conditions of employment for the Bargaining Unit Employees; and (iv) that Respondent violated Sections 8(a)(1) and 8(a)(5) of the NLRA by refusing to provide the Union information.  (*See* Mov. Br. at 33–45; Oct. 10, 2024 Hrg. Tr. at 49–77).

Respondent argues Petitioner is not likely to succeed on the merits because Petitioner has not shown, by a preponderance of credible evidence, that Respondent (as opposed to JSK) has committed the unfair labor practices alleged in the Complaint.  (Opp. Br. at 7–16).  Respondent contends the evidence submitted to ALJ Merritt in the underlying NLRB proceedings "consisted largely of testimony and exhibits related to the unfair practices of JSK," not Respondent.  (*Id.* at 13).  According to Respondent, "[t]here have been no findings of fact, a hearing[,] or other adjudication of liability on the part of [Respondent]."  (*Id.* at 10).  Thus, Respondent "does not believe that the region will prevail on the merits, and if it did such a finding would be reversable." (*Id.* at 4).

In reviewing the parties' submissions, the parties' arguments made on the record during the Hearing, and the administrative record from the underlying NLRB proceedings, the Court finds Petitioner is likely to succeed on the merits in establishing that Respondent violated Sections 8(a)(1), 8(a)(3), and 8(a)(5) of the NLRA.

***First***, Petitioner is likely to succeed on the merits in showing that Respondent, as a successor to JSK under *Burns* and its progeny, violated Sections 8(a)(1) and 8(a)(5) of the NLRA by refusing to recognize and bargain with the Union.  The NLRB has held that an employer violates the duty to bargain collectively under Section 8(a)(5) of the NLRA when it "institute[s] changes regarding matters which are subjects of mandatory bargaining under [Section] 8(d) [of the NLRA]

and which are in fact under discussion" without first providing notice to the union and a meaningful opportunity to bargain about the change to an agreement or impasse. *See NLRB v. Katz*, 369 U.S. 736, 737 (1962); *see also Coral Harbor Rehab. & Nursing Ctr. v. NLRB*, 945 F.3d 763, 767 (3d Cir. 2019), *as amended* (Jan. 6, 2020) (noting an ALJ held that an entity "violated Sections 8(a)(5) and [8(a)](1) of the NLRA by refusing to recognize and bargain collectively with the [u]nion, and by making unilateral changes to the wages and benefits of the [employees] without notice to the [u]nion or giving it an opportunity to bargain over the changes"). "The Supreme Court has held that 'the bargaining obligation of section 8(a)(5) is activated' when a 'new employer makes a conscious decision to maintain generally the same business and to hire a majority of its employees from the predecessor.'" *Fernbach ex rel. NLRB v. Sprain Brook Manor Rehab, LLC*, 91 F. Supp. 3d 531, 541 (S.D.N.Y. 2015) (quoting *Fall River*, 482 U.S. at 41). "The Supreme Court has interpreted section 8(a)(5) to prohibit an employer from unilaterally changing those conditions of employment that are the subject of mandatory bargaining without notice to the union and an opportunity to bargain." *Id.* (citing *NLRB v. Katz*, 369 U.S. 736, 743 (1962)). "Mandatory bargaining conditions include 'wages, hours, and other terms and conditions of employment,' such as whether the employer subcontracts employee work where the employer 'merely replaced existing employees with those of an independent contractor to do the same work under similar conditions of employment.'" *Id.* (citations omitted).

Here, Respondent's counsel, without citing to any record evidence, represented that there was testimony from Mr. Jaffrey before the NLRB ALJ "that they had offered to negotiate on several instances with the [U]nion and that [the Union] refused to respond unless, as a precondition, [Respondent] agreed to the GRIWA[,]" which Respondent was unwilling to do and asserts it does not have to do under *Burns*. (*See* Oct. 10, 2024 Hrg. Tr. at 55). However,

Petitioner's counsel stated "there's no evidence in the record that Mr. Jaffrey attempted to negotiate with the [U]nion or that the [U]nion refused to respond or that it demanded that Respondent accept the terms of the GRIWA" and suggested that "[p]erhaps these are settlement discussions that [Respondent's counsel] may have had with the [U]nion at some point, but there is no such evidence in the record." (*Id.* at 56). Whether or not Respondent or Respondent's counsel made any prior *offers* to negotiate with the Union, it appears undisputed that Respondent has not recognized nor bargained with the Union to date. Therefore, Petitioner is likely to succeed on the merits in showing that Respondent, as a successor to JSK under *Burns* and its progeny, violated Sections 8(a)(1) and 8(a)(5) of the NLRA by refusing to recognize and bargain with the Union.[25]

**Second**, Petitioner is likely to succeed on the merits in showing that Respondent's initial refusal to hire and later termination of the six then-working Union Supporters (excluding Ms. Sanchez) violated Sections 8(a)(1) and 8(a)(3) of the NLRA because Petitioner can meet its *prima facie* burden under the *Wright Line* test. To make out a claim under Section 8(a)(3), "the employee must establish that the protected conduct was a substantial or motivating factor for the employer's action." *NLRB v. United Scrap Metal PA, LLC*, 116 F.4th 194, 198 (3d Cir. 2024) (cleaned up) (quoting *1621 Route 22 W. Operating Co. v. NLRB*, 825 F.3d 128, 145–46 (3d Cir. 2016)). "Once this is accomplished, the burden shifts to the employer to demonstrate that it would have reached the same decision absent the protected conduct." *Id.* This is the burden-shifting analysis the NLRB articulated in *Wright Line*, 251 N.L.R.B. 1083 (1980). *See 1621 Route 22 W. Operating Co.*, 825 F.3d at 145. "The [NLRB] has often summarized the elements usually required to sustain the General Counsel's initial burden under *Wright Line* as (1) union or other protected activity by the

---

[25]    This conclusion is supported by ALJ Merritt's decision finding that Respondent, as a *Burns* successor to JSK, violated Sections 8(a)(1) and 8(a)(5) of the NLRA by refusing to recognize and bargain with the Union. (*See* D.E. No. 18-1 at 17–19).

employee, (2) employer knowledge of that activity, and (3) animus against union or other protected activity on the part of the employer." *Intertape Polymer Corp. & Loc. 1149 Int'l Union, United Auto. Aerospace & Agric. Workers of Am. (Uaw), Afl-Cio*, 372 N.L.R.B. 133, at *7 (Aug. 25, 2023), *enf'd*, *NLRB v. Intertape Polymer Corp.*, No. 23-1831, 2024 WL 2764160, at *1 (6th Cir. May 9, 2024).   "The employer's motivation in firing the employee is essential to finding a violation, and the [NLRB] may look to both direct and circumstantial evidence to determine whether an unlawful motive exists." *NLRB v. Omnitest Inspection Servs., Inc.*, 937 F.2d 112, 122 (3d Cir. 1991).   "Relevant factors include whether the employer knew about the employee's union activity; whether the employer was hostile towards the union; the timing of the employee's discharge; and the employer's reasons (or lack thereof) for discharging the employee." *Id.* "Motivation is a question of fact that may be inferred from both direct and circumstantial evidence on the record as a whole." *Intertape Polymer Corp.*, 372 N.L.R.B. 133, at *7.   Circumstantial evidence of discriminatory motive could include, "among other factors, the timing of the action in relation to the union or other protected conduct; contemporaneous unfair labor practices; shifting, false, or exaggerated reasons offered for the action; failure to conduct a meaningful investigation; departures from past practices; and disparate treatment of the employee." *Id.*

Here, there is record evidence supporting (i) that the Union Supporters engaged in protected union activity and were known fervent Union supporters; (ii) that Respondent had knowledge of the six then-working Union Supporters' union activity; and (iii) that the Union Supporters were initially not hired and later terminated (and in the case of Ms. Sanchez, refused to be reinstated) by Mr. Jaffrey, the Hotel's general manager, against whom record evidence exists reflecting his anti-union animus.[26] (*See* Mov. Br. at 35–40; Oct. 10, 2024 Hrg. Tr. at 57–70).   This

---

[26]    In her decision, ALJ Merritt notes several examples of Mr. Jaffrey's anti-union animus and found that this animus and "his knowledge of employees' pro-union activities is imputed to [Respondent]."   (D.E. No. 18-1 at 20).

record evidence, combined with evidence of Respondent's anti-union animus, suggests that the Union Supporters' protected conduct was a "substantial" or "motivating" factor in Respondent's termination of these employees; as Petitioner notes in its moving brief, the record shows that the six then-working Union Supporters "were all experienced workers, and there is no evidence that they were anything other than exemplary employees."  (Mov. Br. at 36; *see also* Oct. 10, 2024 Hrg. Tr. at 22 (Petitioner's counsel stating the Union Supporters "were the ones with the most seniority and the most experienced workers, and there is no evidence that there was any problem with their performance at all")).  Accordingly, Petitioner is likely to succeed in meeting its *prima facie* burden under the *Wright Line* test.  Respondent has not demonstrated, through record evidence, that it would have reached the same decision regarding the Union Supporters had they not been fervent supporters of the Union.

Respondent argues that all former JSK employees were fired on August 18, 2023, not just the six then-working Union Supporters (*see* Opp. Br. at 12, 15; Oct. 10, 2024 Hrg. Tr. at 26), but this statement seems to contradict other record evidence and a stipulated fact in the underlying NLRB proceedings, which states:

> On August 19, 2023, Respondent Fairfield took over operations of the [H]otel from Respondent JSK.  Between August 19, 2023, and August 21, 2023, [B]argaining [U]nit [E]mployees Krsytal [*sic*] Basulto, Noreen Basulto, Stephanie Bembridge, Hansaben Nakrani, Tulsibhai Nakrani, Champakla Patel, Meenaxibe Patel, Natverlad

---

ALJ Merritt further found that "even if [Mr.] Jaffrey's union animus could not be imputed to [Respondent], [Respondent]'s disparate treatment in hiring all of the bargaining unit employees except the six [then-working] openly pro-union employees by itself constitutes strong evidence of animus."  (*Id.* at 21 (citing cases)).  Additionally, ALJ Merritt states Respondent "offers no explanation whatsoever for why it hired all of JSK's bargaining unit employees except for the six [then-working] Union adherents on August 19, [2023,] when it took over operations[,]" which she found "especially suspect as the six [then-working Union Supporters] who were not hired were the ones with the longest working history in those positions at the [H]otel and there is no evidence that they were anything other than exemplary employees."  (*Id.*).  ALJ Merritt determined that Petitioner "demonstrated by a preponderance of the evidence that anti[-]union animus was the motivating factor in [Respondent]'s decision not to employ the six [then-working Union Supporters]" and that Respondent violated Sections 8(a)(1) and 8(a)(3) of the NLRA by initially refusing to hire (and later terminating) them.  (*Id.* at 21–22).

> Lad and Chetnakumari Lad performed housekeeping and breakfast
> attending work.

(D.E. No. 1-7 at 3).  Further, even accepting Respondent's position that all former JSK employees were indeed terminated on August 18, 2023 (i.e., the day before Respondent took over Hotel operations from JSK), it is undisputed that on the next day, August 19, 2023, Respondent employed all former JSK employees except for the Union Supporters—i.e., the nine other Bargaining Unit Employees.  (*See id.*; Oct. 10, 2024 Hrg. Tr. at 28–29).  Three days later, on August 22, 2023, Respondent rehired the six then-working Union Supporters (excluding Ms. Sanchez) for a ninety-day probationary period to comply with N.J. Stat. Ann. § 29:4-13, but subsequently terminated them on December 8, 2023.  (*See* D.E. No. 1-7 at 4; Mov. Br. at 18–19, 22–23, 32, 37–38; Reply Br. at 3 n.9, 3–4, 8).  Thereafter, Respondent's contract with HCS went into effect, and the Court understands that the nine Bargaining Unit Employees (excluding the Union Supporters) are currently employed by Respondent through HCS.  (*See* D.E. No. 1-7 at 4; Mov. Br. at 23–24; Opp. Br. at 5, 12–13).  The record evidence also reflects that (i) HCS was formed by Elcira Sanchez on August 17, 2023 (the same day that Respondent entered into the contract with HCS and two days before Respondent took over Hotel operations from JSK), and (ii) Elcira Sanchez herself committed unfair labor practices for JSK, including hiring employees in 2022 to try and dissipate the Union's majority support.  (*See* Mov. Br. at 8–9, 11 n.50, 14, 36 (citing record evidence)).  Other than stating its intention was to subcontract bargaining unit work to HCS (and with respect to Ms. Sanchez, stating that her medical leave had expired), Respondent has not articulated any reason for, nor pointed to any record evidence showing, why it did not want to hire, and later terminated, the Union Supporters.  Rather, the record evidence seems to show that anti-union animus motivated Respondent's decision to not hire/terminate the Union Supporters, irrespective of whether they intended to subcontract bargaining unit work to HCS.  In addition, anti-union

animus may have also motivated Respondent's decision to subcontract the bargaining unit work to HCS, which is an entity formed by Elcira Sanchez, against whom evidence also exists reflecting her anti-union animus.  Indeed, Respondent states in its opposition brief that "Union recognition and bargaining are antithetical to [its] operational plan which calls for the subcontracting of service employees."  (Opp. Br. at 15).  Therefore, Petitioner is likely to succeed on the merits in showing that Respondent's initial refusal to hire and later termination of the six Union Supporters (excluding Ms. Sanchez) violated Sections 8(a)(1) and 8(a)(3) of the NLRA.[27]

*Third*, Petitioner is likely to succeed on the merits in showing that Respondent's unilateral changes in the terms and conditions of employment violated Sections 8(a)(1), 8(a)(3), and 8(a)(5) of the NLRA.  Petitioner argues that as a *Burns* successor, Respondent could have set initial terms and conditions of employment without bargaining with the Union, provided that it set those terms *before* the duty to bargain arose—*e.g.*, by providing the Union and/or the Hotel employees advance notice that there would be a change in ownership with new terms and conditions of employment and what those new terms and conditions of employment would be—but it is undisputed that Respondent did not do so here.  (*See* Mov. Br. at 34–35, 40–42, 57–66; Reply Br. at 6–7; Oct. 10, 2024 Hrg. Tr. at 30–33, 70–78).  Petitioner contends that "where a successor has not set its own initial terms, the successor is obligated to maintain the established terms and conditions of employment, and provide the Union notice and an opportunity to bargain before any changes." (Mov. Br. at 34).  As such, because "Respondent did not set initial terms and conditions of employment before August 19,[ 2023,] when it took over operations and employed a majority of

---

[27]    This conclusion is supported by ALJ Merritt's decision finding that Respondent violated Sections 8(a)(1) and 8(a)(3) of the NLRA by initially refusing to hire and later terminating the six then-working Union Supporters (excluding Ms. Sanchez).  (*See* D.E. No. 18-1 at 19–22).  Additionally, while ALJ Merritt did not find that Respondent's refusal to reinstate Ms. Sanchez violated Sections 8(a)(1) and 8(a)(3) of the NLRA, Her Honor did find that Respondent's failure to reinstate Ms. Sanchez violated Sections 8(a)(1) and 8(a)(5) of the NLRA by "unilaterally chang[ing] the terms and conditions of employment as laid out in the GRIWA[.]"  (*See id.* at 22–24).

the unit," the terms and conditions of employment the Union accepted were those of the expired GRIWA to the extent those terms were not modified by JSK. (*Id.* at 34–35).

In opposition, Respondent contends that under *Burns*, it should not be forced to adopt the terms and conditions of the expired GRIWA to which it was not a party. (Opp. Br. at 13, 16–20; Oct. 10, 2024 Hrg. Tr. at 43–46, 72–78). Respondent seems to place blame on JSK, stating "*JSK* had not satisfied its obligations to its former employees in the form of notice and the settlement of its other obligations to its employees" and that "*JSK* should have given written notice to its employees pursuant to the [NLRA] and advised that there was to be a mass layoff as of the date [Respondent] began operations." (Opp. Br. at 6 (emphasis added)). However, Respondent does not articulate why it did not exercise its right to set initial terms and conditions on or prior to taking over Hotel operations from JSK. In reply, Petitioner states that contrary to Respondent's assertion, it is not stating Respondent has to adopt the expired GRIWA but rather that because Respondent did not exercise its right to set new terms and conditions of employment, it is bound to the terms and conditions of employment that existed when Respondent took over Hotel operations from JSK, which consisted of the terms and conditions of the GRIWA, to the extent not modified by JSK, unless and until Respondent bargains with the Union in good faith to a new agreement or to impasse. (Reply Br. at 6–7; Oct. 10, 2024 Hrg. Tr. at 30–33, 70–78). Petitioner asserts that "[i]f Respondent bargains in good faith with the Union to impasse, Respondent is free to lawfully implement new terms and conditions of employment." (Mov. Br. at 62).

Although the parties dispute the *status quo ante* terms and conditions that should apply (*see, e.g.*, Oct. 10, 2024 Hrg. Tr. at 52–57, 70–77), it appears undisputed that Respondent did not set initial terms and conditions of employment when it took over Hotel operations from JSK on August 19, 2023, i.e., prior to its duty to bargain with the Union arose under *Burns*, and therefore,

Petitioner is likely to succeed on the merits of showing that Respondent violated Sections 8(a)(1), 8(a)(3), and/or 8(a)(5) of the NLRA by unilaterally changing terms and conditions of employment for Bargaining Unit Employees without first bargaining with the Union.[28] *See Burns*, 406 U.S. at 294–95 ("Although a successor employer is ordinarily free to set initial terms on which it will hire the employees of a predecessor, there will be instances in which it is perfectly clear that the new employer plans to retain all of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms.").[29]

*Fourth*, and finally, Petitioner is likely to succeed on the merits in showing that Respondent violated Sections 8(a)(1) and 8(a)(5) of the NLRA by refusing to provide the Union the information the Union requested—namely, information regarding the entities or individuals who hold an interest in the Hotel and/or Respondent and information regarding the identity of Union bargaining unit members, their contact information, and other employment-related information—because it is undisputed that Respondent has not provided the Union this

---

[28]    This conclusion is supported by ALJ Merritt's decision finding that Respondent was a *Burns* successor on August 19, 2023, and as such "was obligated to maintain the status quo with regard to established terms and conditions of employment," and that Respondent violated Sections 8(a)(1) and 8(a)(5) of the NLRA by unilaterally changing those terms and conditions of employment without providing the Union prior notice and an opportunity to bargain. (*See* D.E. No. 18-1 at 22–26). ALJ Merritt found no evidence showing that Respondent "announced or set its own initial terms and conditions of employment prior to taking over operations on August 19, or prior to the Union's request to meet and bargain on August 21." (*Id.* at 23).

[29]    *See also NLRB v. Advanced Stretchforming Int'l, Inc.*, 233 F.3d 1176, 1181 (9th Cir. 2000) ("Courts have approved the [NLRB]'s application of the forfeiture doctrine in instances where an employer seeks to avoid obligations of successorship by strategically refusing to hire its predecessor's employees based on their union membership. In *Kallmann*, for example, we enforced the [NLRB]'s finding that a successor forfeited its right to set initial terms of employment when it refused to hire a certain number of its predecessor's union employees in order to avoid application of a rule that would have required it to bargain before setting terms." (citations omitted)); *Dunbar ex rel. NLRB v. Onyx Precision Servs., Inc.*, 129 F. Supp. 2d 230, 237 (W.D.N.Y. 2000) ("Ordinarily, [] a successor is not bound by its predecessor's collective bargaining agreement and is free to set the initial terms of employment for its workers without first consulting with their union[,]" but "a successor employer forfeits its right under *Burns* to set initial terms and conditions of employment when, from the outset, it makes clear that it will not fulfill its corresponding *Burns*' obligations. . . . Moreover, even if [respondent], as a successor, could set initial [u]nit terms and conditions of employment, its failure to set such initial terms on March 13, 2000, the first day of its takeover, resulted in the establishment of the then existing terms. When [respondent] first took over, it failed to change any of the [u]nit's terms and conditions of employment. As a result, [respondent] could not make subsequent unilateral changes without notice to and bargaining with [the union]." (citations omitted)).

information.[30]   Indeed, Respondent stipulated that "[o]n August 25, 2023, via email, the Union requested information regarding terms and conditions of employees in the [bargaining] [u]nit, as set forth in Exhibit C to the Complaint" and that it "has not produced the information that the Union requested on August 25, 2023."  (D.E. No. 1-7 at 4; *see also* Mov. Br. at 19–20, 42–45). The Court is not aware of any other record evidence showing Respondent has provided this requested information to the Union.

Therefore, the Court finds Petitioner is likely to succeed on the merits of establishing that Respondent violated Sections 8(a)(1), 8(a)(3), and 8(a)(5) of the NLRA.

### B.    Irreparable Harm

"When it comes to the second factor, irreparable harm, '[t]he law . . . is clear in this Circuit: In order to demonstrate irreparable harm, the [petitioner] must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Siemens USA Holdings Inc. v. Geisenberger*, 17 F.4th 393, 407–08 (3d Cir. 2021).  Such loss must not be merely economic, but "of a peculiar nature, so that compensation in money cannot atone for it." *A.O. Smith Corp. v. FTC*, 530 F.2d 515, 525 (3d Cir. 1976).  In the context of Section 10(j) cases, "while a district court may not presume irreparable injury with regard to likely unfair labor practices generally, irreparable injury is established if a likely unfair labor practice is shown along with a present or impending deleterious effect of the likely unfair labor practice that would likely not be cured by later relief." *Frankl*, 650 F.3d at 1362.  For example, violations of NLRA Section 8(a)(5), "continuation of that unfair labor practice, failure to bargain in good faith, has long been understood as likely causing an irreparable injury to union representation." *Id.*  Additionally, the NLRB "must establish that irreparable harm is likely, not just possible, in order to obtain a

---

[30]       This conclusion is supported by ALJ Merritt's decision finding that Respondent violated Sections 8(a)(1) and 8(a)(5) of the NLRA by refusing to provide the Union the information it requested.  (D.E. No. 18-1 at 27–28).

preliminary injunction." *Id.* at 1355 (citation omitted).  "[T]he appropriate test for whether harm is irreparable in the context of § 10(j) . . . cases is whether the employees' collective bargaining rights may be undermined by the . . . [asserted] unfair labor practices and whether any further delay may impair or undermine such bargaining in the future."  *Kreisberg v. HealthBridge Mgmt., LLC*, 732 F.3d 131, 142 (2d Cir. 2013) (alterations in original) (citation omitted).  For example, "[i]t is well settled that 'the fear of employer retaliation after the firing of union supporters is exactly the "irreparable harm" contemplated by § 10(j).'"  *Overstreet*, 2024 WL 4186825, at *15 (citations omitted).

Here, Petitioner argues that "absent the swift restoration of the status quo, Respondent's unlawful actions will inflict irreparable harm to the national labor policy protecting employees' right to organize and encouraging collective-bargaining and undermine the efficacy of the Board's ultimate remedial order."  (Mov. Br. at 46).  Moreover, without timely injunctive relief that requires Respondent to "recognize and bargain with the Union, reinstate the seven pro-Union employees, and return terms and conditions of employment to the lawful status quo existing under [JSK], Respondent will succeed in its ultimate goal of driving the Union from its workplace and permanently deprive its employees of their chosen bargaining representative."  (*Id.*; *see also id.* at 45–58).  Petitioner also contends that support for the Union among the remaining employees has been chilled by Respondent's actions with respect to the Union Supporters and "will inevitably continue to deteriorate as they see that the Union is unable to protect them or affect their working conditions" and that "[a]bsent interim reinstatement under the protection of an injunction [], a final Board order will come too late to erase the chilling effect left by Respondent's retaliatory actions against the [Union Supporters]."  (*Id.* at 50, 55).  Petitioner states that "[w]ithout reinstatement and a court order to restore the *status quo ante*, the Union cannot effectively represent the employees

in bargaining." (Reply Br. at 11). Petitioner thus asserts that "[o]rdering Respondent to bargain now, before the loss of employee support is final and irrevocable, offers the best chance of preserving the Union's support, protecting employee rights, and maintaining the [NLRB]'s remedial authority." (Mov. Br. at 51). Additionally, Petitioner's counsel asserted at the Hearing that a Section 10(j) injunction is needed to prevent irreparable harm—namely, to protect the collective bargaining process and the NLRB's remedial power, in addition to prevent union chill in that as time goes on, "[s]upport for the [U]nion dwindles and the ability for the [U]nion to bargain on the employees' behalf also dwindles." (Oct. 10, 2024 Hrg. Tr. at 80–82).

Respondent argues there is no irreparable harm because "there have been no findings of loss or irreparable harm in the underlying proceeding[,]" the NLRB's claims of irreparable harm are "merely speculative," and "[t]he only possible damages are monetary which have yet to be proven." (Opp. Br. at 4, 10, 20). Respondent asserts "[t]here have been no proofs of loss and no finding that [it] is responsible for any of the failings of JSK, against whom the [NLRB] has obtained a judgment," and further states that while the NLRB "may have satisfied the criteria for an injunction against JSK," it has not done so as against it. (*Id.* at 4). At the Hearing, Respondent's counsel stated there is no irreparable harm other than monetary damages. (Oct. 10, 2024 Hrg. Tr. at 83–85).

The Court finds Petitioner has shown there is a likelihood of irreparable harm and that Section 10(j) injunctive relief is needed to protect the collective bargaining process and the NLRB's remedial power, as well as to prevent union chill. As noted above, courts have held that "continuation of [the] unfair labor practice, failure to bargain in good faith, has long been understood as likely causing an irreparable injury to union representation." *Frankl*, 650 F.3d at 1362. *See also Pye ex rel. NLRB v. Excel Case Ready*, 238 F.3d 69, 75 (1st Cir. 2001) (noting "the

fear of employer retaliation after the firing of union supporters is exactly the 'irreparable harm' contemplated by § 10(j)"); *NLRB v. Electro–Voice, Inc.*, 83 F.3d 1559, 1572 (7th Cir. 1996) (noting the "chilling effect" on union organization that often follows the unlawful discharge of key union members).

### C.    Balance of the Equities and Public Interest

The last two elements, the balance of the equities and public interest, look at whether imposing the requested injunctive relief will result in a greater harm to the nonmoving party and whether granting the injunction is in the public interest. *See Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805–07 (3d Cir. 1998). "In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Overstreet*, 2024 WL 4186825, at *16 (quoting *Amoco Prod. Co.*, 480 U.S. at 542). "Specifically, in assessing whether a Regional Director has satisfied the balance of the equities prong, 'the district court must take into account the probability that declining to issue the injunction will permit the alleged unfair labor practice to reach fruition and thereby render meaningless the [NLRB]'s remedial authority.'" *Id.* (quoting *Small*, 661 F.3d at 1196).

Public interest can be defined a number of ways, but "[i]n [Section] 10(j) cases, the public interest is to ensure that an unfair labor practice will not succeed because the [NLRB] takes too long to investigate and adjudicate the charge." *Avanti Health Sys., LLC*, 661 F.3d at 1197 (quoting *Frankl*, 650 F.3d at 1365). Ordinarily, when the petitioner "makes a strong showing of likelihood of success and of likelihood of irreparable harm, [it] will have established that preliminary relief is in the public interest." *Frankl*, 650 F.3d at 1365. Additionally, "the public has an interest in ensuring that the purposes of the [NLRA] be furthered." *Walsh v. Liberty Bakery Kitchen, Inc.*,

No. 17-10721, 2017 WL 2837006, at *2 (D. Mass. June 30, 2017) (alteration in original) (quoting *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 28 (1st Cir. 1986)).  The Supreme Court has also stated that "[w]ith respect to the offending employer himself, it must be obvious that it cannot be in the public interest to permit the violator of the [NLRA] to shed all responsibility for remedying his own unfair labor practices by simply disposing of the business." *Golden State Bottling*, 414 U.S. at 186–87 (quoting *Perma Vinyl Corp.*, 164 N.L.R.B. 968, 970 (1967)).

Here, Petitioner argues the balance of equities favors granting Section 10(j) injunctive relief because "[i]n contrast to the serious irreparable harms to employees' rights, the Union's representative status, the collective-bargaining process[,] and the Board's remedial authority, any harm to Respondent from a temporary injunction is minimal." (Mov. Br. at 59; *see also* Oct. 10, 2024 Hrg. Tr. at 88–93).  Petitioner asserts that a temporary bargaining order under Section 10(j) "would not compel agreement to any specific terms or conditions of employment that the Union may pursue in negotiations" but rather simply requires Respondent to "bargain with the Union in good faith to either an agreement or a bona fide impasse" and that "[w]hile collective-bargaining entails costs in terms of time and money spent, this burden will fall upon both Respondent and the Union and therefore does not defeat a request for an interim bargaining order." (Mov. Br. at 59–61).  Petitioner further states that "[i]nterim reinstatement of the seven [Union Supporters] will also cause little, if any, harm to Respondent" and that "the importance of preventing harm to the bargaining process outweighs the interests of any replacement employees that Respondent may have hired." (*Id.* at 61–62).  Additionally, Petitioner contends "[t]he risk of harm to Respondent from rescission of its unilateral changes is not overly burdensome" in that "[i]f Respondent bargains in good faith with the Union to impasse, Respondent is free to lawfully implement new terms and conditions of employment." (*Id.* at 62).  According to Petitioner, "injunctive relief

ensures that the Respondent does not profit from its illegal conduct, protects the employees' Section 7 rights, safeguards the parties' collective-bargaining process, preserves the remedial power of the Board, and effectuates the will of Congress."  (*Id.* at 66).

Petitioner further argues the balance of equities weighs in its favor because "Respondent's assertion that preliminary relief would put it at economic risk is without any support" and "[t]he other potential harm Respondent cites is interference with its right to conduct its business as intended," but "Respondent has not shown how its business has benefitted from subcontracting the unit work to HCS[,]" and "[t]o the contrary, the evidence demonstrates that it is more cost-effective to directly hire the unit employees."  (Reply Br. at 12).  Petitioner contends that "Respondent's refusal to recognize and bargain with the Union and its unlawful discharge of [the] Union [S]upporters are causing significant ongoing harm[,]" and waiting for a final order from the NLRB "to require Respondent to bargain with the Union and reinstate the Union [S]upporters will risk rendering those remedies meaningless and effectively extinguish employees' rights under the [NLRA]."  (*Id.*).  Additionally, Petitioner contends "interim injunctive relief would serve the public interest by [i] protecting the employees' right to engage in Section 7 activity, [ii] safeguarding the parties' collective-bargaining process, and [iii] preserving the [NLRB]'s remedial power."  (Mov. Br. at 66).

Respondent does not specifically address the balance of equities, but construing Respondent's opposition brief broadly, it seems Respondent is implicitly arguing that it would be unfair to force an assets-only purchaser to bargain with a union with which it has no agreement and/or to be bound to the terms and conditions of an expired collective-bargaining agreement to which it was not a party.  (*See* Opp. Br. at 11, 20).  Respondent asserts the Union would have it "assume unknown and unmeasured liabilities because the previous operator breached its

contractual and legal obligations" but "[n]one of this is [its] doing." (*Id.* at 11). However, Respondent contends that as the purchaser of business assets and not the liabilities of JSK, nor JSK's obligations to the Union or its former employees, it "should be permitted [to] conduct its business as intended in the purchase and sale documents which do not violate the law." (*Id.*)

Additionally, Respondent conclusorily states "[a]n injunction is not in the public interest" and "[t]he public interest will not be served by granting [Section] 10(j) relief" but does not explain why. (*Id.* at 4, 11). Rather, Respondent contends that nothing will prevent the HCS employees "from organizing and forming a labor organization of their choosing if they are inclined to do so" and "[t]hat is the only 'public interest' that is appropriate to protect." (*Id.* at 11). Respondent asserts it "is not the employer and has no interest [i]n whether or not [HCS] employees are organized or not." (*Id.*).

The Court finds that the balance of the equities weighs in Petitioner's favor and that a Section 10(j) injunction is in the public interest. Regarding balance of the equities, any harm Respondent "might suffer from a temporary injunction is inherently limited, as it 'will only last until the [NLRB]'s final determination.'" *Sacks v. I.N.S.A., Inc.*, No. 23-12368, 2024 WL 2187012, at *8 (D. Mass. May 14, 2024) (quoting *Asseo*, 805 F.2d at 28). Additionally, "when the [employer] is not compelled to do anything except bargain in good faith, the risk from a bargaining order is minimal," as the employer is not required "to do anything that would cause it harm; it need do nothing more than follow the ordinary obligations of an employer under the law." *Walsh*, 2017 WL 2837006, at *2 (alteration in original) (quoting *Small*, 661 F.3d at 1196). Further, reinstatement of the six Union Supporters (excluding Ms. Sanchez) would not be overly burdensome to Respondent in that these are experienced, skilled employees from whose work Respondent would benefit, and further, Respondent would not be prevented from lawfully

managing or disciplining the employees.  Whereas, without injunctive relief, Respondent "would reap the benefit of having committed unfair labor practices while the [U]nion would be forced to wait for reinstatement, with its support waning in the interim." *Walsh*, 2017 WL 2837006, at *2. Further, temporary injunctive relief is needed to protect the collective bargaining process and the NLRB's remedial power, as well as the employees' rights under Section 7 of the NLRA.  Thus, any potential hardship to Respondent pending a final determination by the NLRB is outweighed by the potential hardship to be suffered by the Union and the Bargaining Unit Employees. Additionally, Section 10(j) injunctive relief is in the public interest. *See, e.g.*, *Frankl*, 650 F.3d at 1365; *Walsh*, 2017 WL 2837006, at *2.

In sum, based on the parties' submissions, the parties' arguments on the record at the Hearing, and the administrative record from the underlying NLRB proceedings, and for good cause having been shown, the Court finds Section 10(j) injunctive relief is warranted under the four *Winter* factors in that (i) Petitioner has sufficiently established a reasonable probability that it will succeed on the merits of its claims that Respondent is a successor to JSK under *Burns* and its progeny and that Respondent violated Sections 8(a)(1), 8(a)(3), and 8(a)(5) of the NLRA; (ii) Petitioner has sufficiently shown that irreparable harm will occur absent the requested temporary injunctive relief; (iii) Petitioner has sufficiently established the balance of equities tips in its favor; and (iv) Petitioner has sufficiently shown Section 10(j) injunctive relief is in the public interest. Therefore, the Court **GRANTS** Petitioner's Petition for temporary injunctive relief pursuant to Section 10(j) of the NLRA, as outlined in the accompanying Order filed herewith, pending the NLRB's final disposition of the underlying NLRB proceedings.

## IV.    CONCLUSION

Based on the foregoing, Petitioner's Petition for temporary injunctive relief pursuant to Section 10(j) of the NLRA (D.E. Nos. 1 & 1-13) is **GRANTED**, pending the NLRB's final disposition of the underlying NLRB proceedings.  An appropriate Order follows.


**Dated:** January 7, 2025                                         _s/ Esther Salas_
                                                                          **Esther Salas, U.S.D.J.**